Good morning. I'm David Straighten, Counsel for the United Transportation Union. Speak up, sir, a little bit. I'm David Straighten. I'm the Counsel for the United Transportation Union. Good morning. All right. And I'll reserve six minutes for closing. Reserve six minutes? I mean, it gives you four minutes. I'm sorry. Reserve four minutes for closing. Oh, okay. First mistake I ever made. All right. Well, you have to keep an eye on that. Yeah, will do. May it please the courts. The district court's decision, in our view, impermissibly interferes with the clear language of Ex Parte 282, Subpart 9, which is the governing decision under the Interstate Commerce Act. Do you think there's anything clear about the language in any of these statutes or the regulations, Counsel? I think they're quite clear. It just takes a road map to get to them. I would say so. Yeah. The Ex Parte 282 explicitly states that the immunity clause of ICA 11321A is not available in class exemptions of this kind, and the district court's reimposition, essentially, of that immunity is a clear interference in the ICA and the ICC's decision then. If there's an application of this court's Railway Labor Executives v. Southern Pacific, which protected the exclusive jurisdiction of the commission and, of course, the board, to make a decision and define it, if that is applicable to this case, it protects Ex Parte 282 from being interfered with by the district court. Counsel, let me just ask you a few questions. I want to see where you and the other side have some agreement on this. Is LSC an, in quotes, rail carrier within the meaning of the regulations, specifically 49 CFR section 1182D7? Well, the Service Transportation Board concluded that it was. Okay. And is it an, in quotes, other carrier under the same regulation? That would be a switching company, and so the answer is, according to the STB, no. No. Right. Okay. So it's our view, then, that Railway Labor Executives, if it has an application, and, of course, it's a very different case than this in some regards because it's a highly regulated merger, but if it has an application, it is the authority for this court to overturn the interference that we believe the district court imposed upon them. Can I ask you another question? Yes, sir. We're talking about highly technical construction of some rather poorly drafted statutes here in regulations, but let me ask you this. From the perspective of the union, is the transaction an accepted transaction under 10906 or an exempted transaction under 1180.2D7? It's exempt, and we have no disagreement with that. It's not accepted. It's exempt. Correct. So the language we think that supplies the requirement that bargaining take place in an exempt transaction, in addition to the lack of the immunity, which, of course, allows the Railway Labor Act to have full force and effect, and, of course, the Railway Labor Act requires that there be bargaining, but under 11326, the statute states that that's the Mendocino protection statutes, and it states nothing in this subchapter or subtitle, meaning the Mendocino subtitle, prohibits the carrier and the union from making such an arrangement. That is to say collective bargaining is available in spite of that element, and the Supreme Court and the ICC defined 11326 and its interplay in the rest of the statute as meaning that rules, pay, working conditions, and all collective bargaining rights and privilege shall not be abridged except by collective bargaining agreements or applicable statutes. Counsel, was this matter and, in quotes, minor dispute under the regulation? No, this is a major dispute in our view, yes. Do you have any case law that substantiates that? Yes, we do. The Conrail, of course, applies. That's the Supreme Court's latest ruling on the case, and in Conrail, although it is a relatively low threshold, there are two things that this Court is asked to do. One is to look for sincerity. That is to say, is there a validity to the pleading, in this case of the railroad, that it's minor, and also is the characterization of the implied contract term that the railroad suggests is there, does that characterization match any other contract that exists? And we believe that it's not sincere because there's not one scintilla of evidence that this union has given up its right to bargain over changes in working conditions, and particularly not in a circumstance where there may, in fact, be an alter ego, anti-union activity. But you do concede, do you not, that the LSC has employees, it has its own union agreements, et cetera? Yes. You call it an alter ego, but it's really a separate company, admittedly one owned by the other railroads, but it is a separate company, is it not? Well, it's half owned by Burlington Northern, but for the purposes of the Railway Labor Act and that particular question, a separate company can be used for an alter ego purpose. What are the criteria for determining whether a company is being used as an alter ego? Well, interlocking management and directorship, which LSC has. The employees of LSC are paid Burlington Northern checks. The yardmaster that used to run LSC, the Longview Junction Yard, was a BN yardmaster. So your own case in Butte, Anaconda, and Pacific, as well as the Springfield Terminal case that we cited a great deal in our brief, suggests that the alter ego relationship is not necessarily a wholly owned subsidiary, but a controlled company that can be used for an alter ego anti-union purpose. And we think that Longview Switching Company fits that. If you want to save your time, this is the time to sit down. Thank you very much. Thank you. Good morning, Your Honors. Donald Monroe for the Rail Carriers. This is actually, Your Honors, Judge Beha, you're correct. This is, I'm sorry, got folded over. Thank you for it. I apologize, Your Honor. This is a complicated area. I practice in it all the time, and I still get confused. But this particular question that is before the Court today is actually well settled. There's three circuits that have already ruled on this question. And with all due respect to my colleague, the ICC has clearly come down in favor of the position that we advocate. Counsel cites ex parte 282, which was the rulemaking procedure in the class exemptions for trackage rights. And he's quite right that in that decision, the ICC said, if you're talking about an exempt transaction, one that's been exempted under 105.05, the former designation of statute, you don't get the antitrust immunity. And I have to admit, when I first read that, that gave me pause. However, in 1991, the same agency, the one that is tasked with implementing and administering this statute, in a case called Rio Grande Industries, 199 ICC Lexus 57, for reasons that now escape me, I cited it only in a footnote in our brief, addressed this exact question and said that when you're talking about labor protection, ex parte 282 does not apply. They specifically said, we disavow that decision with respect to labor protection. And it addresses exactly the kind of exempt trackage rights agreement we're talking about here. And what the commission said in that case is that what's important is that- By the way, do we owe the commission Chevron deference? Yes, Your Honor, you do. It said that what's important here is that there is an alternative procedure that has been established. When you have a transaction that is a section 113, a subchapter 2 transaction, which everybody agrees trackage rights agreements between two carriers are a subchapter 2 transaction, it doesn't matter whether it's been approved or exempted, because the commission must, the statute says, apply labor protective conditions. And it says that because labor protective conditions have been applied, it displaces the Railway Labor Act. You then obtain the immunity of all other law. And the commission says, it's very clear, it says, in summary, the approval of labor protective conditions in a consolidation lease or trackage rights transaction is a statutory duty performed not under 105.05, but under 113.47, regardless of whether exemption or application procedures are followed. And since 113.47 is contained in subchapter 2, the conditions of the immunity are satisfied. Let me ask a question that's somewhat more practical in my mind. This agreement eliminates one position from Burlington Northern, which is represented by UTU, and adds one position to LSC, which is represented by UTU. Do I have that right? Yes, Your Honor. What's the big beef? I think you'll have to ask my opponent that question. Keep that in mind. In our view, there's a Walter Mondale response. I may be too young for that, Your Honor. I'm sorry. You ought not have said that. I'm sorry, sir. I do know who Walter Mondale was. I think in light of Rio Grande and the various circuit decisions that have come down on this point, there's really not a question about this. It's complicated, but well decided. And I think unless the Court has any further questions, I will sit down. With respect to the labor protective conditions, we're talking about the ones that are mentioned as dispatchers, that is six years' pay infringes on anybody who loses his job. Yes, Your Honor. With one minor caveat, the labor protective conditions that apply in merger transactions, such as were discussed in the Supreme Court's decision in Norfolk and Western, apply only in merger transactions. There's a separate set of conditions that apply to trackage rights agreements. Counsel has referred to the Mendocino Coast conditions. I actually believe it's the Norfolk and Western conditions, but they're basically the same. They all provide six years of protection. So if you're displaced by one of these transactions, you can go and sit at home for six years and draw full pay and benefits. And there's additional arbitration mechanisms to resolve disputes, which is what we submit should have happened here. Unless there's any further questions. Thank you. Okay, Mr. Strayton, you know what I want to hear. Well, the beef, as you put it, is this. The Railway Labor Act and labor relations in general has two goals. One is to resolve a dispute, and the other is to maintain labor peace. And what maintains labor peace is process. And these Mendocino protections or the Norfolk and Western protections do not provide process. Do you agree, though, Mr. Strayton, that Mr. Monroe's comment that in terms of the economic treatment of your workers, they are not adversely impacted by this trackage arrangement? Well, a particular worker may not be, but the union is. Because if there's an alter ego at play, they're interfering with the union. No, no, it may be just the other way around. You may have somebody on a board who doesn't have seniority and gets kicked off on Burlington. But another job starts on the LSC, but that fellow not necessarily will be transferred to LSC. So it may actually harm a railroad worker. Well, a railroad worker that is displaced from Burlington will have to go down to Vancouver, and an LSC worker who is already there will take the job. Right. But that's union seniority, and what I'm addressing really is the effect of the anti-union effect if, in fact- Do Burlington and LSC represented by UTU have cross seniority? They do not. They're separate entities. So that's the beef. Our view is that the underpinning of the Railway Labor Act and, in fact, the Interstate Commerce Act is that labor peace must be maintained, and that is done through procedure. The problem with Mendocino and Norfolk and Western type protections is they do not provide procedure. But isn't your beef really with the ICC and with the Congress and the regulations? No, it's not. It may surprise you that a union would be singing the praises of deregulation, but that deregulation in this instance removes the immunity which allows the Railway Labor Act to have full force in effect. And we don't have any beef with the Service Transportation Board's exemption decision, and we have no beef with Ex parte 282, which outlines- You've lost me here. The fact that the Service Transportation Board has jurisdiction, which I gather you're conceding, means that you've got nothing to complain about in the district court because there's no subject matter jurisdiction, doesn't it? No, that's not correct. The subject matter jurisdiction in the district court was based on the belief that, or in his opinion, that the immunity did apply. Therefore, there was no resort to the Railway Labor Act, which meant there was no resort- Right, right. And in our view, the immunity does not apply for reasons that I disagree with my counsel friend here over, but also because the language of the Interstate Commerce Act makes it very clear that in these kinds of situations, railroads and unions may either take Mendocino protections or bargain under the Railway Labor Act or take both. And the circuits and the Supreme Court are very clear on that. And in the Pittsburgh case, although it's different because it's an accepted case, the overarching view of that is very clear. Thank you. Thank you very much, Mr. Straten. The case of UTU versus Burlington Northern will be submitted. Thank you very much.
judges: Bea, Smith, Hood